[Cite as *State v. Jones*, 2026-Ohio-2790.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 25AP-368 |
| v. | : | (C.P.C. No. 22CR-991) |
| Jamale S. Jones, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on July 21, 2026

**On brief:** *Shayla D. Favor*, Prosecuting Attorney, and *Jeffrey D. Devereaux*, for appellee. **Argued:** *Jeffrey D. Devereaux*.

**On brief:** *Dennis C. Belli*, for appellant. **Argued:** *Dennis C. Belli*.

APPEAL from the Franklin County Court of Common Pleas

BEATTY BLUNT, J.

{¶ 1} Defendant-appellant, Jamale S. Jones, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of one count of murder and one count of felonious assault, both with firearm specifications. For the following reasons, we affirm.

I. **Facts and Procedural History**

{¶ 2} On May 24, 2021, Raymond Sims and his 16-year-old nephew, Ty'sean Finch, went to the Popeye's restaurant on West Broad Street in Columbus, Ohio so Finch could apply for a job. As Sims and Finch walked through the Popeye's parking lot, a group of three young men approached them. One of the young men wore a gray hooded sweatshirt ("gray hoodie") pulled up tightly around his face and dark pants; one wore a dark-colored

shirt and pants and white shoes; and the other wore a white shirt and jeans. As the young men approached, Sims saw the individual in the dark-colored clothing hand the individual in the gray hoodie a gun. The young men indicated they wanted to fight Finch, so the group walked across the street from the Popeye's to the parking lot of a former Burger King restaurant.

{¶ 3} Once they arrived in the other parking lot, Finch and the individual in the dark-colored clothing began to fight. Sims and the other two young men stood off to the side watching the fight. As the two fought, the individual in the gray hoodie walked away from Sims and the other young man and approached the fight. When the individual in the dark-colored clothing stepped to the side, the individual in the gray hoodie took out a gun and fired multiple shots directly at Finch. Finch fell to the ground and the other two young men ran from the scene. Sims ran toward the gray hoodie shooter and punched him on the side of his face, causing him to drop his gun. The gray hoodie shooter then produced a second gun with an "extender clip" and began shooting at Sims. (Tr. at 243-245.) Sims picked up the gun the shooter dropped, noting the gun was black and white. The individual in the gray hoodie shot Sims in his neck and shoulder and then fled the scene.

{¶ 4} After being shot, Sims ran out into the street and signaled to passing cars for help. Several vehicles pulled over to render assistance. As cars were pulling into the parking lot, the individual in the dark-colored clothing returned to the scene and began firing shots at Sims. Sims jumped into the window of a passing SUV to escape the gunfire.

{¶ 5} Officers arrived shortly after the incident and found Finch unresponsive, "laying on the ground, suffering from gunshot wounds." (Mar. 11, 2025 Tr. Vol. 2 at 172-173.) Finch had been shot multiple times in different areas on his torso. Medics transported Finch to the hospital where he died from his injuries.

{¶ 6} When Sims left the shooting, he went to the home of his sister and Finch's mother, Terri Sims. Sims was still in possession of the black and white gun he picked up during the incident when he entered the house. Terri took the gun from Sims and placed it in her bedroom closet because her brother was "on parole and probation and [she] didn't want [him] to get in trouble." *Id*. at 210. Terri then drove Sims to the hospital for treatment.

{¶ 7} On May 27, 2021, police took appellant into custody. At the time of his arrest, appellant had abrasions on his lip and forehead and was in possession of an Apple iPhone

12 Pro ("iPhone"). Police subsequently obtained a warrant to search the contents of the iPhone.

{¶ 8} On May 29, 2021, officers presented Sims with photo arrays, but Sims did not identify anyone from the arrays. Detective Michael Huffman, the lead detective on the case, noted the surveillance videos of the May 24, 2021 shooting demonstrated that Sims had "face-to-face contact with the male in the hooded sweatshirt prior to the shooting. So to [Detective Huffman], [Sims] should have been able to make an identification off of anything that was put in front of him." (Mar. 12, 2025 Tr. Vol. 3 at 592.) As such, Detective Huffman decided to present Sims with another set of photo arrays.

{¶ 9} On June 6, 2021, Officer Luke Veile presented Sims with three photo arrays containing six photographs each. Sims selected the photo of Dalyne Coleman from the first photo array and told Officer Veile that Coleman "was the shooter 'might have been.' " (Mar. 11, 2025 Tr. Vol. 2 at 322; State's Ex. W1.) Sims selected the photograph of Shedrick Miller from the second photo array and told Officer Veile that Miller was "in background with suspects, shot once at me." (State's Exs. W4, 6.) Sims selected appellant's photograph from the third photo array and told Officer Veile appellant "was the shooter, dark blue hoody, jeans, black shoes, hoody was pulled up tight, 'for sure, guaranteed.' " (State's Ex. W7.)

{¶ 10} Police eventually recovered the black and white firearm from the closet at Terri Sims' house. The firearm was a 9mm Taurus pistol with serial number ABE602111 that was partially "spray painted white." (Mar. 12, 2025 Tr. Vol. 3 at 400, 524; State's Ex. C42.) On June 1, 2021, police apprehended Dalyne Coleman as he was walking out of the rear of a house located on North Central Avenue in Columbus, Ohio. Coleman was in possession of a 9mm Taurus pistol with serial number ABN336839 when he was apprehended. The firearm had an extended magazine. Ballistics testing revealed that both Taurus pistols fired multiple shots during the May 24, 2021 incident. A police database also revealed that both Taurus pistols were stolen.

{¶ 11} On June 8, 2021, plaintiff-appellee, State of Ohio, filed a complaint in the Franklin County Court of Common Pleas, Juvenile Branch alleging appellant was a delinquent minor for having committed the offenses of murder and felonious assault, both with firearm specifications. The complaint alleged appellant was 16 years old at the time of

the offenses. On June 9, 2021, the state moved the juvenile court to relinquish jurisdiction and transfer the case to the Franklin County Court of Common Pleas, General Divsion pursuant to R.C. 2152.12(A) and/or (B).  Following hearings held on January 18 and 19, 2021, the juvenile court granted the state's motion and transferred the case to the general division of the court of common pleas.

{¶ 12} By indictment filed March 17, 2022, the state charged appellant with one count of murder, in violation of R.C. 2903.02, an unclassified felony, and one count of felonious assault, in violation of R.C. 2903.11, a felony of the second degree.  Both charges carried firearm specifications.  The indictment alleged appellant purposely caused the death of Finch and knowingly caused serious physical harm to Sims during the May 24, 2021 shooting incident.  Appellant pled not guilty to the charges.

{¶ 13} On March 10, 2025, a jury trial on the charges commenced. The state presented surveillance videos to the jury depicting the May 24, 2021 incident.  Detective Huffman testified at trial explaining that his investigation into the shooting led him to identify certain juveniles living at the house on North Central Avenue as persons of interest. North Central Avenue is located approximately 500 feet from where the shooting occurred. The individuals living at North Central Avenue included appellant, Shedrick Miller, Jayontay Hoskins-Battle, and Dalyne Coleman.  Sims testified at trial and identified appellant as the individual who shot him and killed Finch on May 24, 2021.  (Mar. 11, 2025 Tr. Vol. 2 at 258-259.)

{¶ 14}  During deliberations, the jury informed the trial court they could not come to an agreement on a verdict.  The court provided the jury with the instruction stated in *State v. Howard*, 42 Ohio St.3d 18 (1989), at paragraph two of the syllabus ("*Howard* charge"). Following the *Howard* charge, the jury returned verdicts finding appellant guilty on all counts and specifications charged in the indictment.

{¶ 15} On April 10, 2025, the trial court held a sentencing hearing.  The court sentenced appellant to a prison term of 15 years to life on the murder charge, a minimum prison term of 6 years and a maximum prison term of 9 years on the felonious assault charge, and respective prison terms of 36 months each on the firearm specifications.  The court ordered all counts to run consecutive to each other and consecutive to the

specifications for a total minimum prison sentence of 27 years and a total maximum prison sentence of 30 years.

## II.  Assignments of Error

{¶ 16} Appellant appeals, assigning the following errors for our review:

> **Assignment of Error No. 1:**
> The proceedings to transfer defendant-appellant from juvenile court to the court of common pleas for adult prosecution violated R.C. 2152.12 and deprived him of his right to fundamental fairness under the due process protections of the United States and Ohio Constitutions.
>
> **Assignment of Error No. 2:**
> The admission of false testimony implicating defendant-appellant in an uncharged drive-by shooting violated the rules of evidence and deprived him of his due process right to a fundamentally fair trial under the Fourteenth amendment to the United States Constitution.
>
> **Assignment of Error No. 3:**
> Defendant-appellant was denied his right to the effective assistance of counsel, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, due to the combined prejudicial impact of multiple instances of deficient performance.
>
> **Assignment of Error No. 4:**
> The trial court's erroneous Evid.R. 613(A) ruling and interference with defense counsel's cross-examination deprived defendant-appellant of his rights of confrontation and due process under the Sixth and Fourteenth Amendments to the United States Constitution.
>
> **Assignment of Error No. 5:**
> The trial court violated defendant-appellant's due process rights under the Fourteenth Amendment to the United States Constitution by requiring him to appear for trial wearing leg irons.

## III.  First Assignment of Error–Bindover Proceeding

{¶ 17} In his first assignment of error, appellant asserts the proceeding to transfer his case from juvenile court to adult court for criminal prosecution violated R.C. 2152.12 and deprived him of his right to due process.  Appellant contends the juvenile court's order

relinquishing jurisdiction was not supported by probable cause, was obtained through prosecutorial misconduct, and was not accompanied by an adequate statement of reasons.

{¶ 18} "Juvenile courts possess exclusive jurisdiction over children alleged to be delinquent for committing acts that would constitute a crime if committed by an adult." *State v. Lucas*, 2011-Ohio-3450, ¶ 19 (10th Dist.), citing *In re M.P.*, 2010-Ohio-599, ¶ 11. Under certain circumstances, however, the juvenile court "has the duty" to transfer a case, or bind a juvenile over, to the adult criminal system. *In re M.P.* at ¶ 11. Ohio's juvenile justice system provides for two types of transfers: discretionary and mandatory. *State v. D.W.*, 2012-Ohio-4544, ¶ 10.

{¶ 19} " 'Discretionary transfer, as its name implies, allows judges the discretion to transfer or bind over to adult court certain juveniles who do not appear to be amenable to care or rehabilitation within the juvenile system or appear to be a threat to public safety.' " *D.W.* at ¶ 10, quoting *State v. Hanning*, 2000-Ohio-436, ¶ 19. R.C. 2152.12(B) governs discretionary transfers and directs the juvenile court to determine whether the factors in R.C. 2152.12(D), "indicating that the case should be transferred," outweigh the factors in R.C. 2152.12(E), "indicating that the case should not be transferred." R.C. 2152.12(B)(3).

{¶ 20} "Mandatory transfer, on the other hand, removes discretion from judges and requires the transfer of a juvenile to adult court in certain situations." *State v. Nicholas*, 2022-Ohio-4276, ¶ 3, citing *Hanning* at ¶ 20. *See State v. J.T.S.*, 2015-Ohio-1103, ¶ 41 (10th Dist.) (noting that "substantive due process did not prevent the General Assembly from removing the [amenability] factors from consideration" for mandatory bindover offenses). R.C. 2152.12(A) governs mandatory transfers and provides, in relevant part, that after a complaint has been filed alleging a child is delinquent for committing an offense that would have been murder if committed by an adult, the juvenile court shall transfer the case to adult court so long as the child was "sixteen or seventeen years of age at the time of the act charged . . . and there is probable cause to believe that the child committed the act charged." R.C. 2152.12(A)(1)(a)(i). Appellant stipulated he was 16 years old on May 24, 2021. Accordingly, because appellant was charged with murder, R.C. 2152.12(A) required the juvenile court to transfer the case to adult court so long as there was probable cause to believe appellant committed the offense. *See State v. Martin*, 2022-Ohio-4175, ¶ 15.

{¶ 21} Probable cause is a " ' "fluid concept—turning on the assessment of probabilities in particular factual contexts." ' " *Martin*, at ¶ 16, quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003), quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Probable cause "requires 'more than bare suspicion,' " as the "circumstances must demonstrate a 'fair probability' that a crime has been committed." *Id.* at ¶ 18, quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949) and *Gates* at 238. The probable cause determination involves questions of both law and fact. *In re A.J.S.*, 2008-Ohio-5307, ¶ 51. As such, we defer to the juvenile court's "determinations regarding witness credibility, but we review de novo the legal conclusion whether the state presented sufficient evidence to demonstrate probable cause to believe that the juvenile committed the acts charged." *Id.* at ¶ 51. *Accord Martin* at ¶ 23.

{¶ 22} To establish probable cause, the state "must produce evidence that raises more than a mere suspicion of guilt, but [it] need not provide evidence proving guilt beyond a reasonable doubt." *State v. Iacona*, 93 Ohio St.3d 83, 93 (2001). The juvenile court must "assess the credibility of the evidence and [] determine whether the state has presented credible evidence going to each element of the charged offense," but the juvenile court "is not permitted to exceed the limited scope of the bindover hearing or to assume the role of the ultimate fact-finder." *In re A.J.S.* at ¶ 44. *See also State v. Zarlengo*, 2021-Ohio-4631, ¶ 22 (7th Dist.) (stating that "[a]s to credibility and weight, a juvenile court has a limited role and is not to discount testimony presented by the state so as to intrude on the role of a jury at a later trial").

**(1) Probable Cause**

{¶ 23} On January 18, 2022, the juvenile court held a bindover hearing in appellant's case. The state initially called Sims to testify, but Sims was a volatile witness. Sims told the court he was "scared of [him]self," because he "don't do this snitching shit." (Jan. 18, 2022 Jones Bindover Tr. at 15-16.) Sims then stated that what he "really want[ed] to do [was] kill [appellant's mother]," telling her, "I want your kid . . . I want your dog. I want your cat. Your goldfish. . . I could kill you. . . . I'm crazy. I'm crazy." *Id.* at 16-17.) Shortly after these statements, the court went off record. When the hearing resumed, Sims had left the witness stand and the state called Detective Huffman to testify. Although Detective Huffman attempted to state that appellant was the gray hoodie shooter on May 24, 2021, and that

Sims identified appellant as the gray hoodie shooter from the June 6, 2021 photo array, the juvenile court sustained defense counsel's objections to both statements. *Id*. at 26, 34.

{¶ 24} Following appellant's bindover hearing on January 18, 2022, the juvenile court held another bindover hearing in Hoskins-Battle's case. The state had charged Hoskins-Battle with one count of felonious assault, alleging he knowingly caused or attempted to cause physical harm to Sims by means of a deadly weapon on May 24, 2021. Sims testified at Hoskins-Battle's bindover hearing, stating that during the May 24, 2021 incident his nephew had a "little fist fight" with the "dude in the blue shirt" and that the "taller one in the grey hoodie" then approached and shot his nephew. (Jan. 18, 2022 Hoskins-Battle Hearing Tr. at 16-17.) Sims stated he began "shootin' " once "one of 'em, the younger one, he comes back" and "start shootin'." *Id*. at 20. The prosecutor asked Sims if the "person that came back and was shooting at [him] . . . [was] he in the courtroom today?" *Id*. at 20-21. Sims asked for the deputies to stand next to him, noting it would take "everything in [his] power to get to this man." *Id*. at 22. Sims then identified Hoskins-Battle and stated "he shot my nephew. He killed him." *Id*. at 23. The prosecutor asked, "Okay. Did he shoot at you?" *Id*. at 23. Sims responded stating, "Yeah, he shot me twice." *Id*. at 23.

{¶ 25} On cross-examination, Hoskins-Battle's attorney asked Sims if the person who shot his nephew was wearing "the blue shirt," and Sims responded stating, "[n]o, the grey one. . . . The hoodie." *Id*. at 25. When Hoskins-Battle's attorney told Sims his client was wearing "all black [that] day," Sims responded stating "your client wasn't wearing black that day. . . . Your client was wearing a grey hoodie . . . ." *Id*. at 26.

{¶ 26} Detective Huffman also testified at Hoskins-Battle's bindover hearing. Detective Huffman explained he interviewed Hoskins-Battle during his investigation and went over the surveillance video footage of the incident with him. Detective Huffman stated Hoskins-Battle admitted he was the individual in the dark-colored clothing who fought Finch prior to the shooting and who fired shots at Sims at the end of the incident. *Id*. at 47-54. Detective Huffman identified appellant as the individual wearing the gray hoodie on the surveillance video. *Id*. at 49. At the conclusions of Hoskins-Battle's hearing, the juvenile court found probable cause to believe Hoskins-Battle committed the felonious assault charge.

{¶ 27} On January 19, 2022, the juvenile court resumed the bindover hearing in appellant's case. The state again called Sims to testify, and Sims identified appellant as the person who shot him and killed Finch on May 24, 2021. Sims also stated he selected appellant's photo from a photo array presented to him on June 6, 2021, because appellant "killed [his] nephew" and "shot [him]." (Jan. 19, 2022 Jones' Hearing Tr. at 21.) On cross-examination, defense counsel asked Sims if he identified another individual as being the gray hoodie shooter at Hoskins-Battle's bindover hearing the prior day. Sims responded stating he "pointed out the same person that [the prosecutor showed him on the photo array]. And [he] told her the same thing that, like, the one in the gray hoodie." *Id.* at 45. At the conclusion of the January 19, 2022 hearing, the juvenile court found probable cause to believe appellant committed the offenses charged in the complaint.

{¶ 28} Appellant contends Sims' identification of him as the shooter was "incredible as a matter of law," and insufficient to support a finding of probable cause, because Sims identified both appellant and Hoskins-Battle as the gray hoodie shooter in juvenile court. (Appellant's Brief at 15-16.) However, the juvenile court judge was free to believe all, part, or none of each witness's testimony. *In re A.E.*, 2008-Ohio-1375, ¶ 26 (10th Dist.); *State v. Antill*, 176 Ohio St. 61, 67 (1964). Thus, the judge was free to believe Sims' testimony identifying appellant as the gray hoodie shooter, and to disbelieve Sims' testimony identifying Hoskins-Battle as the gray hoodie shooter. The juvenile court found Sims' identification of appellant to be credible, and we defer to the juvenile court's assessment of Sims' credibility. *In re A.J.S.*, 2008-Ohio-5307, at ¶ 51. *See also State v. Tucker*, 2016-Ohio-1033, ¶ 13 (10th Dist.), quoting *State v. Reed*, 2008-Ohio-6082, ¶ 48 (10th Dist.) (stating that " '[w]hile identity is an element that must be proven by the state beyond a reasonable doubt [at trial], the credibility of witnesses and their degree of certainty in identification are matters affecting the weight of the evidence' ").

{¶ 29} Furthermore, the Supreme Court of Ohio has held that "the resolution of the conflicting theories of the evidence, both of which were credible, is a matter for the trier of fact at a trial on the merits of the case, not a matter for exercise of judicial discretion at a bindover hearing in the juvenile court." *In re A.J.S.* at ¶ 64. *Accord Iacona*, 93 Ohio.St.3d at 96 (stating that deciding the merits of competing prosecution and defense theories of the

case is "a matter for a factfinder at trial"). Accordingly, the juvenile court was under no obligation to resolve the conflict between Sims' contradictory identifications.

{¶ 30} Because Sims identified appellant as the individual who shot him and killed Finch on May 24, 2021 during appellant's bindover hearing, the record contained sufficient, credible evidence demonstrating that appellant committed the offenses of murder and felonious assault and the attendant firearm specifications. As such, the evidence supported the juvenile court's probable cause determination in the present case. Because the murder charge was subject to mandatory transfer under R.C. 2152.12(A)(1)(a)(i), and the trial court also found probable cause to believe appellant committed the felonious assault charge, R.C. 2152.12(F)(2) required the juvenile court to transfer the felonious assault charge to adult court as well.

### (2) Prosecutorial Misconduct

{¶ 31} Appellant contends the prosecutor engaged in misconduct at the successive bindover hearings in juvenile court by deliberately eliciting contradictory identifications from Sims. The same prosecutor represented the state at both appellant's and Hoskins-Battle's bindover hearings.

{¶ 32} When evaluating allegations of prosecutorial misconduct, we determine whether (1) the prosecutor's conduct was improper, and (2) if so, whether it prejudicially affected the defendant's substantial rights. *State v. Thompson*, 2014-Ohio-4751, ¶ 162. Because prosecutorial misconduct inherently concerns due process, the touchstone of the analysis "is the 'fairness of the trial, not the culpability of the prosecutor.' " *State v. Newton*, 2006-Ohio-81, ¶ 92, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982). *See also State v. Buck*, 2017-Ohio-8242, ¶ 76 (1st Dist.), quoting *State v. Widmer*, 2013-Ohio-62, ¶ 41 (12th Dist.) (noting that "[m]ere inconsistencies in testimony do not establish the knowing use of false testimony by the prosecutor").

{¶ 33} Appellant claims the prosecutor at Hoskins-Battle's bindover hearing asked Sims to "confirm that '[t]he person you just pointed to' was the gray-hooded killer." (Appellant's Brief at 16-17, citing Hoskins-Battle Hearing at 23.) However, the record demonstrates the prosecutor asked Sims if the "person *that came back and was shooting at you* . . . [was] he in the courtroom today?" (Emphasis added.) (Jan. 18, 2022 Hoskins-Battle Probable Cause Hearing 20-21.) Sims identified Hoskins-Battle and the prosecutor

asked Sims to explain, "[w]hat is it that Mr. Battle did? The person you just pointed to, what was he doing that day?" *Id.* at 23. Sims responded stating that Hoskins-Battle shot his nephew and killed him. The prosecutor then asked Sims, "Okay. Did he shoot *at* you?" (Emphasis added.) *Id.* at 23. Sims responded stating "Yeah, he shot me twice." *Id.* at 23.

{¶ 34} Thus, the prosecutor asked Sims if Hoskins-Battle was the person who came back and shot at him. The prosecutor never asked Sims to confirm that Hoskins-Battle was the gray hoodie shooter. Rather, Sims stated that Hoskins-Battle wore the gray hoodie during the May 24, 2021 incident in response to Hoskins-Battle's attorney's question on cross-examination. *Id.* at 26.

{¶ 35} The prosecutor also attempted to clarify Sims' testimony. On re-direct examination at Hoskins-Battle's hearing, the prosecutor presented Sims with the June 6, 2021 photo array where Sims identified appellant as the gray hoodie shooter. The prosecutor asked Sims to describe appellant's role in the May 24, 2021 incident, and Sims responded stating, he "shot me twice" and "killed my nephew; shot my nephew four times." *Id.* at 30. The prosecutor also elicited testimony from Detective Huffman at Hoskins-Battle's hearing explaining that Hoskins-Battle wore the dark-colored clothing while appellant wore the gray hoodie during the May 24, 2021 incident. Accordingly, appellant fails to demonstrate that the prosecutor engaged in any misconduct when she subsequently asked Sims if appellant was the gray hoodie shooter during appellant's bindover hearing.

### (3) Statement of Reasons

{¶ 36} Appellant lastly contends the juvenile court failed to issue a statement of reasons for transferring the case to adult court. To satisfy due process in the bindover context, the juvenile court must "issue[] a decision stating its reasons for the transfer after conducting a hearing at which the juvenile is represented by counsel." *State v. Aalim*, 2017-Ohio-2956, ¶ 24, citing *Kent v. United States*, 383 U.S. 541, 554 (1966). Juv.R. 30(G) provides that the "order of transfer shall state the reasons for transfer." *See also D.W.*, 2012-Ohio-4544, ¶ 20, quoting *Kent* at 554 (stating that the transfer of a juvenile to adult court should not occur without " 'ceremony -- without hearing, without effective assistance of counsel, without a statement of reasons' ").

{¶ 37} On January 24, 2022, the juvenile court issued an entry stating that, based on the stipulations and evidence presented at appellant's bindover hearing, the court found

appellant was 16 years old at the time of the offenses and probable cause to believe appellant committed the acts of murder and felonious assault and the firearm specifications. As such, the juvenile court granted the state's motion and transferred the case to adult court for prosecution.

{¶ 38} Appellant claims the juvenile court's statement of reasons was insufficient because the court failed to "reconcile contradictory testimony from [Sims] identifying two different persons as being the lone killer." (Appellant's Brief at 18.) As noted, however, the juvenile court was free to believe Sims' identification of appellant as the gray hoodie shooter and was under no obligation to resolve conflicting theories of evidence. *In re A.J.S.*, 2008-Ohio-5307, at ¶ 64. Accordingly, the court did not need to reconcile Sims' contradictory identifications in its statement of reasons. Because the present case involved a mandatory transfer, the juvenile court adequately stated its reasons for the transfer by finding appellant was 16 years old at the time of the offenses and probable cause to believe appellant committed the offenses charged in the complaint.

{¶ 39} Based on the foregoing, we overrule appellant's first assignment of error.

## IV. Second Assignment of Error—Evid.R. 404(B)

{¶ 40} In his second assignment of error, appellant asserts the trial court violated Evid.R. 404(B) and deprived him of a fundamentally fair trial by admitting testimony implicating him in an uncharged drive-by shooting. "Evid.R. 404(B) categorically prohibits evidence of a defendant's other acts when its only value is to show that the defendant has the character or propensity to commit a crime." *State v. Smith*, 2020-Ohio-4441, ¶ 36. However, other acts evidence may be admissible "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evid.R. 404(B)(2). *See also State v. Echols*, 2024-Ohio-5088, ¶ 31, citing *State v. Morris*, 2012-Ohio-2407, ¶ 18 (noting that the non-propensity examples in the rule are illustrative, not exclusive). "The key is that the evidence must prove something other than the defendant's disposition to commit certain acts." *State v. Hartman*, 2020-Ohio-4440, ¶ 22. The admissibility of other-acts evidence under Evid.R. 404(B) is a question of law that an appellate court reviews de novo. *State v. Worley*, 2021-Ohio-2207, ¶ 117.

{¶ 41} In determining whether to admit other-acts evidence, a court must consider whether the evidence is relevant to the particular purpose for which it is offered, and

whether the non-propensity purpose relates to a material issue in dispute between the parties. *Hartman*, at ¶ 26-27. A court must also determine whether the party offering the evidence has provided " 'substantial proof that the alleged [other] act was committed by the defendant." *Id.* at ¶ 28, quoting *State v. Carter*, 26 Ohio St.2d 79, 83 (1971). *Accord State v. Grate*, 2020-Ohio-5584, ¶ 136 (stating that "[a]dmission of other-acts evidence requires substantial proof that the defendant committed those acts"). Other-acts evidence " 'is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor.' " *Hartman* at ¶ 28, quoting *Huddleston v. United States*, 485 U.S. 681, 689 (1988). *See also State v. Hignite*, 2015-Ohio-5204, ¶ 18 (12th Dist.) (noting that "[o]ther acts evidence need be proved only by substantial proof, not proof beyond a reasonable doubt").

{¶ 42} Prior to trial, the state filed a notice of intention to admit evidence pursuant to Evid.R. 404(B). The state asked the court to allow it to introduce evidence demonstrating that one of the firearms used during the May 24, 2021 shooting also fired a bullet at the home of Finch and Terri Sims during a drive-by shooting on May 23, 2021. The state noted that "one of the persons of interest in regard to the May [] 23rd, 2021 drive by shooting at [] S. Princeton Avenue, who was known by the street name of 'Fat Cat,' was in actuality Jayontay Hoskins-Battle." (Notice of Intention at 3.) The state argued the matching ballistics evidence established identity, possession, intent, plan, motive, and lack of mistake in the case against appellant. *See State v. Curry*, 43 Ohio St.2d 66, 73 (1975).

{¶ 43} Appellant opposed the state's request to introduce the ballistics evidence pursuant to Evid.R. 404(B). Appellant argued the drive-by shooting had "nothing to do with the [him]," noting he "was never charged" with any crime related to the drive-by shooting. (Req. to Deny at 1.) The state responded explaining that, while "no one was charged, nor did anyone plead to the [drive-by] shooting," the "only person of interest that was identified during the investigation by Columbus Police was the Defendant in this case, Jamale Jones." (State's Resp. at 2.) At a December 16, 2024 pre-trial hearing, the trial court granted the state's request to admit the drive-by shooting evidence as "outlined in its motion." (Dec. 16, 2024 Tr. at 77.)

{¶ 44} At trial, Terri Sims stated she contacted police on or about May 23, 2021 to report that her house at South Princeton Avenue "was shot at." (Mar. 11, 2025 Tr. Vol. 2 at

212.) Terri noted no one was home when the shooting occurred. Terri told police that someone named "Fat Cat" was a potential suspect in the drive-by shooting "based off an issue that one of [her] children was having with someone." *Id.* at 214.

{¶ 45} Officer Justin Frisco stated at trial that he responded to a house on South Princeton Avenue on a report of a drive-by shooting. Officer Frisco collected shell casings and spent projectiles near the house and spoke to the residents of the house. Officer Frisco stated the residents of the house "named a nickname of a person that they thought may be responsible for what occurred. The nickname they gave was Fat Cat." (Mar. 13, 2025 Tr. Vol. 4 at 741.) The prosecutor asked Officer Frisco whether he became aware of a "name being attached to that person of interest's nickname," and Officer Frisco responded stating he did and that the name was "Jamale Jones." *Id.* at 741.

{¶ 46} Defense counsel attempted to question Officer Frisco about a police summary report from the drive-by shooting, but the state objected. At a side-bar discussion outside the hearing of the jury, the prosecutor explained that Officer Frisco "wrote down who the person of interest was and then at a later point, another officer [went] back in and connect[ed] Jones to this incident." *Id.* at 749. When defense counsel asked how the police connected appellant to the drive-by, the prosecutor admitted she did not know. *Id.* at 749-750.

{¶ 47} A forensic firearms examiner explained at trial that the Taurus pistol with serial number ABN336839 fired one of the shell casings recovered from the drive-by shooting at South Princeton Avenue. *Id.* at 809-810; State's Ex. M.

{¶ 48} Although appellant did not object to the admission of the drive-by shooting evidence at trial, the court's pre-trial decision granting the state's request to admit the evidence was a definite ruling on the record. As such, appellant did not need to object to the evidence at trial to preserve the issue. *See* Evid.R. 103(A) (stating that "[o]nce the court rules definitely on the record, either before or at trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal"); *Echols*, 2024-Ohio-5088, ¶ 28.

{¶ 49} Appellant contends Officer Frisco's testimony identifying him as Fat Cat was false, and that Officer Frisco's testimony indicating he was a " 'person of interest' in the uncharged drive-by shooting fell well short of satisfying the substantial proof requirement" of Evid.R. 404(B). (Appellant's Brief at 23.) While Officer Frisco stated his investigation

demonstrated appellant was Fat Cat, Detective Huffman testified at trial that Hoskins-Battle's "nickname was Fat Cat." (Mar. 13, 2025 Tr. Vol. 4 at 520.) Detective Huffman explained he was "advised by the family" that Hoskins-Battle's "street name" was Fat Cat. *Id.* at 654. As noted, the state also identified Fat Cat as the nickname of Hoskins-Battle in its notice of intention to admit the evidence pursuant to Evid.R. 404(B).

{¶ 50} Regardless, even if the jury believed Officer Frisco's testimony, that testimony established only that the Sims family suspected appellant may have been responsible for the drive-by shooting. There were no eyewitnesses to the drive-by shooting. While the state indicated in a pre-trial filing and at a side-bar discussion that the police identified appellant as the primary suspect in the drive-by shooting, the state never presented evidence to explain why the police identified appellant as their primary suspect. Indeed, the prosecutor admitted she did not know how the police connected appellant to the drive-by shooting. *Compare State v. Elliott*, 2024-Ohio-3376, ¶ 133-135 (10th Dist.) (finding the victim's statements to police reporting that the defendant pulled her by her hair and shoved her into a bedroom wall "provide[d] substantial proof of the other acts").

{¶ 51} The state argues that because one of the shell casings from the May 23, 2021 drive-by shooting came "from the firearm Jones brought to the May 24, 2021 [shooting]," the matching ballistics evidence "link[ed] Jones to the May 23, 2021 shooting." (Appellee's Brief at 22.) However, the state's argument in this regard assumes appellant was the gray hoodie shooter on May 24, 2021. Detective Huffman testified that stolen firearms tended to be passed around with great frequency and that juveniles tended to "pass [firearms] around very frequently." (Mar. 13, 2025 Tr. Vol. 4 at 530.) The Taurus pistol with serial number ABN336839 was a stolen firearm, and the suspects in the present case were all juveniles. Accordingly, the matching ballistics evidence demonstrated only that the second firearm used by the gray hoodie shooter during the May 24, 2021 shooting also fired a shot during the May 23, 2021 drive-by shooting. The matching ballistics evidence did not, on its own, demonstrate that appellant committed the drive-by shooting.

{¶ 52} Accordingly, because the state failed to present substantial proof that appellant committed the drive-by shooting, the trial court erred by admitting the drive-by shooting evidence under Evid.R. 404(B). As such, we must determine whether the admission of the evidence amounted to harmless error. *State v. Smith*, 2017-Ohio-9283,

¶ 39 (10th Dist.), citing *Morris*, at 2014-Ohio-5052, ¶ 28.  *See* Crim.R. 52 (A) (defining harmless error as "[a]ny error, defect, irregularity, or variance which does not affect substantial rights" and providing that such error "shall be disregarded").  "Error in the admission of other act testimony is harmless when there is no reasonable possibility that the testimony contributed to the accused's conviction."  *State v. Lytle*, 48 Ohio St.2d 391 (1976), paragraph three of the syllabus.  An appellate court must consider "both the impact of the offending evidence on the verdict and the strength of the remaining evidence after the tainted evidence is removed from the record."  *State v. Morris*, 2014-Ohio-5052, ¶ 33.  "[A]n improper evidentiary admission under Evid.R. 404(B) may be deemed harmless error on review when, after the tainted evidence is removed, the remaining evidence is overwhelming."  *Id*. at ¶ 32.

{¶ 53} Initially, because the jury never heard evidence indicating that appellant actually committed the drive-by shooting, we find the impact of the other-acts evidence on the verdict to be minimal. The state also presented a strong case against appellant independent of the drive-by shooting evidence.

{¶ 54} As noted, Sims identified appellant at trial as the individual who shot him and killed his nephew on May 24, 2021.  Appellant argues Sims' identification of him lacked credibility because Sims previously identified both him and Hoskins-Battle as the gray hoodie shooter in juvenile court.  During cross-examination, however, Sims admitted he identified Hoskins-Battle as the gray hoodie shooter in juvenile court.  (Mar. 11, 2025 Tr. Vol. 2 at 298.) As such, the jury could weigh Sims' prior identification of Hoskins-Battle as the gray hoodie shooter when assessing the credibility of Sims' identification of appellant at trial.  *See State v. Teitelbaum*, 2016-Ohio-3524, ¶ 122 (10th Dist.) (noting "it is for the jury to consider conflicting evidence and resolve those conflicts"); *State v. Jamea*, 2022-Ohio-1647, ¶ 36 (10th Dist.), quoting *State v. McGee*, 2010-Ohio-2081, ¶ 31 (8th Dist.) (noting that, " '[r]egarding the credibility of witnesses, we defer to the jury who was best able to weigh the evidence and judge the credibility of witnesses by viewing the demeanor, voice inflections, and gestures of the witnesses testifying' ").

{¶ 55} The jury also heard evidence demonstrating that Sims selected appellant's photograph from the June 6, 2021 photo array and identified him as the shooter.  Appellant contends that Sims initial selection of Coleman's photograph as someone who "might have

been" the shooter weakened Sims subsequent selection of appellant's photograph. (State's Ex. W1.) However, the evidence demonstrated Sims was far more certain in his selection of appellant's photograph.

{¶ 56} The state played the audio recording of the June 6, 2021 photo array presentation at trial. The recording demonstrated how Sims paused for a long time when viewing the initial array containing Coleman's photograph and how he eventually said "I think him, but I'm really not for sure." (State's Ex. W10 at 2:05; Mar. 11, 2025 Tr. Vol. 2 at 327.) Sims eventually selected Coleman's photograph and stated he "might have been the shooter." (State's Ex. W10 at 2:55.) In contrast, when Officer Veile showed Sims the third array containing appellant's photograph, Sims made a nearly instantaneous identification. Once Sims saw the third photo array he said, "nah, he was the shooter, for sure, guaranteed, no mistaken it, he was the one with the hoodie on." (State's Ex. W10 at 6:30.) Sims circled appellant's photograph and stated that appellant had "either a dark blue hoodie on or a gray hoodie, pulled up tight, he had blue jeans, black Jordans." (State's Ex. W10 at 7:10.) Sims then told Officer Veile that "the first one," i.e. Coleman, "wasn't the shooter," but that appellant "was." (State's Ex. W10 at 7:52; Mar. 11, 2025 Tr. Vol. 2 at 329.) Thus, the audio recording of the June 6, 2021 photo array presentation demonstrated Sims certainty in his identification of appellant as the shooter.

{¶ 57} While Coleman was in possession of one of the guns from the May 24, 2021 incident at the time of his arrest on June 1, 2021, Detective Huffman explained it was common for juveniles to pass stolen firearms around to each other. Detective Huffman also stated that during his investigation he learned Coleman had been kicked out of his mother's house and was staying at appellant's house at North Central Avenue. (Mar. 13, 2025 Tr. Vol. 4 at 689.) Thus, the jury could reasonably infer that Coleman would have had access to appellant's firearms.

{¶ 58} The state also presented the jury with evidence regarding the contents of the iPhone that was in appellant's possession at the time of his arrest on May 27, 2021. Detective Michael Robinson, a member of the police department's digital forensics unit, testified regarding the contents of the phone. Detective Robinson explained that shortly after the shooting, the person using the phone changed their name on a "messaging app" such as "WhatsApp" to "skeen_gettingsmoked." (State's Ex. V17; Mar. 14, 2025 Tr. Vol. 5

at 924.) Terri Sims testified that Finch's nickname with his friends was "Skeeno." (Mar. 11, 2025 Tr. Vol. 2 at 208.) On May 27, 2021, at 9:59 a.m., skeen_gettingsmoked messaged someone named "Lost Inna World" stating "Fuck yo mans," along with a video file depicting candles being lit next to a black and white handgun. (State's Exs. V17, 19; Mar. 14, 2025 Tr. Vol. 5 at 926.) Lost Inna World responded stating, "[g]o make money bitch." (State's Exs. V20, 21.) [S]keen_gettingsmoked responded, "[p]arking lot boy," and Lost Inna World said, "CORNBALL." (State's Ex. V22.) [S]keen_gettingsmoked then stated, "I hit him he begged nkk okay to get killed." (State's Ex. V24.) Lost Inna World responded stating, "I cannot wait until the same shi happen to yall no cap." (State's Ex. V25.) [S]keen_gettingsmoked responded stating, "[i]t was bam then rio now ty" and "I wonder who next." (State's Exs. V27, 28.)

{¶ 59} Detective Robinson noted the cellphone data documented a "voluminous amount of firearm/firearm accessory searches" on the internet from May 22, 2021 to May 26, 2021. (Mar. 14, 2025 Tr. Vol. 5 at 945.) The searches included things such as "Taurus Magazines," "g2s taurus 40 cal extended clip," and "taurus g2c 32 round magazine." (State's Exs. V29, 36, 39.) Detective Robinson affirmed that one of the firearms involved the May 24, 2021 shooting was a Taurus 9mm G2C model firearm. (Mar. 14, 2025 Tr. Vol. 5 at 952.) The phone contained a photo of appellant taken on May 14, 2021, depicting him holding a 9mm handgun. (State's Ex. V44; Tr. Vol. 5 at 951.)

{¶ 60} The cellphone data also documented multiple internet searches for information related to the murder. On May 25, 2021, at 8:44 a.m., someone searched for "[t]een among two injured in shooting near downtown Columbus," and at 8:47 a.m. for "west side shooting." (State's Exs. V41, 42.) At 9:26 a.m. on May 25, 2021, someone searched for the victim's full name writing, "TY-sean M Finch." (State's Ex. V30; Tr. Vol. 5 at 935.) From 1:39 p.m. to 6:07 p.m. on May 25, 2021, someone using the phone repeatedly searched for "Teen killed, man wounded in fight that led to shooting in Franklinton." (State's Ex V31; Tr. Vol. 5 at 936.)

{¶ 61} The cellphone data demonstrated that the iPhone was "powered off between 7:03 and 8:49 p.m. on May 24, 2021." (Tr. Vol. 5 at 901.) Detective Robinson noted that, in his experience analyzing phones, when someone turned their phone off for a short amount of time this indicated the user "[did] not want any data going on that cellphone for

whatever reason." *Id.* at 911. Detective Huffman reviewed the surveillance video footage of the May 24, 2021 shooting at trial, and noted that at exactly 7:03 p.m., shortly before the fist fight occurred, the individual in the gray hoodie "appear[ed] to be on a phone of some type. He's got it in his hands staring at it. . . . He puts it back in his pocket." (Mar. 12, 2025 Tr. Vol. 3 at 537.) Photographs from the surveillance video depict the gray hoodie shooter looking at a cellphone, and then putting the phone back in his pocket, at 7:03 p.m. on May 24, 2021. *Id.* at 562-563; State's Exs. O12, 15.

{¶ 62} Appellant argued at trial that someone besides him could have used the phone to send messages and search the internet. Detective Robinson affirmed that, "without corroborating evidence, . . . like, video or another photograph of somebody actually using the cellphone," he could not say with absolutely certainty who was using the phone at any given time. (Mar. 14, 2025 Tr. Vol. 5 at 968.) However, the state presented evidence to permit the jury to infer that appellant was the individual using the phone. Initially, Detective Robinson stated that the cellphone data identified "the owner's name []as Jamale Jones" and that the Apple ID and iCloud accounts on the phone were for Jamalejones99@icloud.com. *Id.* at 888. Detective Robinson also stated there were two unidentified gmail accounts associated with the phone for rossbrown640@gmail.com and maleswervo@gmail.com. *Id.* at 896.

{¶ 63} The cellphone data documented a conversation on a messaging app that occurred on May 27, 2021, at 9:28 a.m., between the user of the phone named "Male Swervo" and Lost Inna World. When Lost Inna World asked "What's yo name lol," Male Swervo responded stating, "Jamale." (State's Ex. V11, 12.) Detective Robinson affirmed that in this text message the person using the phone identified themself as Jamale. (Tr. at 918.) The state also presented evidence of text messages sent to the phone number associated with the iPhone on May 24, 2021. The text messages refer to the recipient of the messages as "Jamale" and "male" stating, "Jamale I just wanna apologize," "ur something special male," "I don't want to loose u male," and "I do really love you jamale I'm sorry." (State's Ex. V45.) At 10:31 p.m. on May 24, 2021, the person using the iPhone responded to these texts stating, "Kk" and "I need a gun ASAP." (State's Ex. V14.)

{¶ 64} Thus, the evidence demonstrated the iPhone was in appellant's possession at the time of his arrest, the phone data identified appellant as the owner of the phone, text

messages on the phone were sent to "Jamale," and the person using the phone identified themself as "Jamale" in a text message. As such, it was reasonable for the jury to infer that appellant was the individual using the phone. Accordingly, the evidence from the cellphone allowed the jury to infer that appellant sent messages admitting he murdered Finch, conducted numerous internet searches for firearms and firearm accessories related to the firearms used during the May 24, 2021 shooting, and that he conducted internet searches for news articles related to the murder shortly after the murder occurred. Additionally, the fact the iPhone powered down at 7:03 p.m. on May 24, 2021, and the gray hoodie shooter could be seen looking at a cellphone at 7:03 p.m. on the surveillance video, strongly indicated that appellant was the gray hoodie shooter. Accordingly, the cellphone data evidence was compelling circumstantial evidence identifying appellant as the perpetrator in the present case. *See State v. Griesheimer*, 2007-Ohio-837, ¶ 26 (10th Dist.), quoting *State v. Bentz*, 2 Ohio App.3d 352, 355, fn. 6 (1st Dist. 1981) (stating that circumstantial evidence is " 'proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind' "); *State v. Stewart*, 2024-Ohio-1448, ¶ 28 (10th Dist.), citing *State v. Bias*, 2022-Ohio-4643, ¶ 36 (10th Dist.) (noting "[i]t is well-settled that the state may establish the identity of a perpetrator by the use of direct or circumstantial evidence").

{¶ 65} Appellant lastly notes there was no forensic evidence, such as DNA, connecting him to the firearms used during the May 24, 2021 shooting. However, the "state is not obligated to produce DNA evidence linking a defendant to the crime to secure a conviction." *State v. Poindexter*, 2021-Ohio-1499, ¶ 22 (10th Dist.). " 'If [witness] testimony is believed then the lack of fingerprints, DNA, footprints or any other physical evidence does not render the conviction against the manifest weight of the evidence.' " *State v. Peeples*, 2014-Ohio-4064, ¶ 21 (10th Dist.), quoting *State v. Jackson*, 2009-Ohio-6407, ¶ 16 (7th Dist.). Accordingly, the lack of DNA evidence in the present case was not critical.

{¶ 66} Reviewing the evidence presented at trial, including Sims' identifications of appellant as the gray hoodie shooter and the incriminating evidence from appellant's cellphone, we find the evidence against appellant was overwhelming. Even removing the drive-by shooting evidence from the record, the remaining evidence strongly demonstrated

that appellant was the gray hoodie shooter who shot Sims and killed Finch on May 24, 2021. Accordingly, considering the strength of the remaining evidence, we find the admission of the drive-by shooting evidence amounted to harmless error.

{¶ 67}  Based on the foregoing, we overrule appellant's second assignment of error.

## V.  Fourth Assignment of Error—Cross-Examination

{¶ 68}  For ease of analysis, we next address appellant's fourth assignment of error. In his fourth assignment of error, appellant contends the trial court violated his Sixth Amendment right to confront his accusers and his Fourteenth Amendment right to due process by interfering with defense counsel's cross-examination of both Sims and Detective Huffman.

{¶ 69}  The Sixth Amendment to the United States Constitution provides a defendant the right "to be confronted with the witnesses against him." *See also* Ohio Const., art. I, § 10. "[T]he Confrontation Clause 'guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish.' " *State v. McAlpin*, 2022-Ohio-1567, ¶ 151, quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).  Trial courts have "wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall* at 679.  Thus, while "[c]ross-examination of a witness is a matter of right," the " 'extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court.' " *State v. Green*, 66 Ohio St.3d 141, 147 (1993), quoting *Alford v. United States*, 282 U.S. 687, 691 (1931).  Absent an abuse of discretion, a trial court's decision to limit cross-examination will not be disturbed on appeal.  *State v. Woodward*, 68 Ohio St.3d 70, 74 (1993). *See State v. Hill*, 2013-Ohio-674, ¶ 16 (10th Dist.), citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983) (stating an "abuse of discretion implies that the court's attitude is unreasonable, arbitrary[,] or unconscionable").

### (1)  Sims Review of the Juvenile Court Transcript

{¶ 70}  Appellant initially contends the trial court impaired his attorney's ability to cross-examine Sims when the court allowed Sims to read his previous statements from juvenile court.  At trial, defense counsel sought to impeach Sims' in-court identification of

appellant as the gray hoodie shooter with Sims' prior identification of Hoskins-Battle as the gray hoodie shooter in juvenile court. When defense counsel asked Sims if he "remember[ed] testifying on [January 18, 2022]," Sims responded stating, "I remember none of y'all. I don't remember none of this shit." (Mar. 11, 2025 Tr. Vol. 2 at 284.) The court personally addressed Sims asking him, "[s]o Mr. Sims you don't remember . . . testifying in 2022, is that correct? You don't remember testifying that day?" *Id.* at 285. Sims responded stating, "No, I don't." *Id.* at 285. When defense counsel began to ask Sims if he remembered stating that "another individual, not [appellant] was actually . . . the shooter," the prosecutor objected and the court sustained the objection. *Id.* at 285.

{¶ 71} At a side-bar discussion outside the hearing of the jury, the trial court noted her "frustration" that "this [was] a cross examination with an intention to evoke the kind of response that we've seen" from this witness. *Id.* at 286. The prosecutor explained that, because Sims didn't remember testifying on January 18, 2022, defense counsel could not "continue to ask him questions about something when he's already said he doesn't have memory of" the event. *Id.* at 287. The court noted defense counsel could "lay the foundation for refreshing [Sims'] recollection" if he wanted to. *Id.* at 287-288.

{¶ 72} When the proceeding resumed in front of the jury, defense counsel asked Sims if he saw a transcript from the January 18, 2022 hearing whether that would "refresh [his] memory?" *Id.* at 289. Sims responded stating, "I don't know. Let me see. I'll have to see it." *Id.* at 289. The court then excused the jury and had Sims read his testimony from Hoskins-Battle's bindover hearing. When Sims finished reading, the jury returned to the courtroom and defense counsel asked Sims if "in th[e] transcript, [he] state[d] that Mr. Hoskins-Battle was the one that shot you?" *Id.* at 298. Sims responded, "Yeah." *Id.* at 298. Counsel then asked, "And you said he shot you twice, isn't that correct?" Sims said, "Yes." *Id.* at 298. Defense counsel then asked Sims if he also "identified [Hoskins-Battle] as wearing the gray hoodie?" And Sims said, "Yeah." *Id.* at 298.

{¶ 73} Although the jury heard Sims affirm that he identified Hoskins-Battle as the gray hoodie shooter in juvenile court, appellant argues the "impeachment lacked the dramatic impact it would have had if the witness did not have an opportunity to rehearse his response." (Appellant's Brief at 48.) Evid.R. 613(A) governs impeachment by self-contradiction and provides that, "[i]n examining a witness concerning a prior statement

made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel." In *State v. Talbert*, 33 Ohio App.3d 282 (3d Dist. 1986), the court observed that if a witness's "testimony and credibility is to be attacked through the device of prior inconsistent statements under Evid. R. 613, the reaction of that witness when confronted with the contrary statements must be seen by the jury." *Id.* at 285. The *Talbert* court observed that allowing the witness to review their prior inconsistent statement before being questioned would "serve[] only to eliminate this key factor." *Id.* at 285. Appellant relies on *Talbert* to argue that the trial court erred by permitting Sims to review his statements from juvenile court before defense counsel questioned him regarding those statements. (Appellant's Brief at 47-48.)

{¶ 74} While Evid.R. 613(A) "relieves a party examining a witness concerning a prior statement of the requirement of first showing it to him or disclosing its contents," the rule "does not relieve the party of the burden of demonstrating that the witness has personal knowledge of the prior statement or its contents." *State v. Young*, 1998 Ohio App. LEXIS 1913, *12 (2d Dist. May 1, 1998). Evid.R. 602 provides that a witness "may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." When a witness states they lack a current recollection of making a prior statement, their "testimony demonstrates a lack of the personal knowledge that Evid.R. 602 requires." *Young* at *12. "In that event, the party who seeks to offer the evidence must accept the response," or "may seek to refresh the witness's recollection pursuant to Evid.R. 612." *Id. See State v. Roman-Navarre*, 2025-Ohio-3156, ¶ 79 (5th Dist.), citing *State v. Owens*, 484 U.S. 554, 558 (1988) (noting that a "witness's inability to recall either the underlying events or the circumstances surrounding a prior statement generally does not implicate the Sixth Amendment").

{¶ 75} Evid.R. 612 governs the use of writings to refresh a witness's memory. The rule provides that a witness may use a writing to refresh memory for the purpose of testifying "if the court in its discretion determines it is necessary in the interests of justice." "Under the doctrine of present recollection refreshed, 'the witness looks at the memorandum to refresh his memory of the events, but then proceeds to testify upon the basis of his present independent knowledge.' " *State v. Ford*, 2019-Ohio-4539, ¶ 230,

quoting *State v. Scott*, 31 Ohio St.2d 1, 5-6 (1972). The testimony of the witness whose memory has been refreshed is the evidence and the content of the statement is not placed before the jury. *State v. Powell*, 2012-Ohio-2577, ¶ 57. "Before using a writing to refresh the recollection of a witness, 'it must be established that the witness lacks a present recollection of the information or events described in the writing.' " *State v. Dumas*, 2025-Ohio-4602, ¶ 30 (2d Dist.), quoting *Dayton v. Combs*, 94 Ohio App.3d 291, 297 (2d Dist. 1993). *See Combs* at 297-298 (observing that "[o]nce the trial court is satisfied that the witness has no present recollection of the relevant information or events, the witness is permitted to read the writing silently or have relevant portions thereof read to him"). Whether a party may refresh the recollection of a witness is a matter for the trial court's discretion. *State v. Pace*, 1998 Ohio App. LEXIS 3613, *11 (10th Dist. Aug. 6, 1998).

**{¶ 76}** The record demonstrates the trial court was satisfied that Sims lacked a present recollection of testifying at Hoskins-Battle's bindover hearing in juvenile court. As such, the trial court complied with the rules of evidence by permitting Sims to refresh his recollection by reading the transcript from the juvenile court hearing. Appellant fails to demonstrate any error in this regard.

### (2) Asked and Answered

**{¶ 77}** Appellant next claims the trial court interfered with defense counsel's cross-examination of Sims when the court directed counsel to move on from asking certain questions. At the start of his cross-examination, defense counsel asked Sims about the underlying events that occurred prior to the shooting on May 24, 2021. When counsel asked Sims if it was "true that they had talked about doing this fighting over across the street," Sims became agitated by counsel's question. (Mar. 11, 2025 Tr. Vol. 2 at 269.) Sims responded stating, "[a]re we just scheduled to go over there and just, you know, we going to meet up right here at this timeframe and then we're going to go over here and fight, . . . I don't understand that logic at all." *Id.* at 269. The prosecutor asked to approach, and a side-bar discussion occurred outside of the jury's hearing.

**{¶ 78}** The trial court told defense counsel "[i]f [he] ha[d] a question, ask it. This feels antagonistic to me and I'm just watching." *Id.* at 270. The judge noted if counsel was "looking for something" she would "give [him] the time to look for those things, but if the question has been asked and answered, let's go to the next one so we can keep this moving."

*Id*. at 270. The proceeding then resumed in front of the jury and counsel asked a different question.

{¶ 79} A judge must "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Evid.R. 611(A) *See also* R.C. 2945.03; Jud.Cond.R. 2.8. Accordingly, " '[t]he trial court is entitled to exercise reasonable control over an attorney's examination of witnesses, and may properly prohibit questions which have been previously asked and answered.' " *State v. Wright*, 1998 Ohio App. LEXIS 3906, *4 (10th Dist. Aug. 25, 1998), quoting *First Natl. Bank of Pandora v. Plott*, 1996 Ohio App. LEXIS 3439 (6th Dist. Aug. 16, 1996). *Accord In re T.T.*, 2010-Ohio-5649, ¶ 51 (6th Dist.).

{¶ 80} The trial court exercised reasonable control over defense counsel's cross-examination by directing counsel to move on from asking Sims questions that were previously asked and answered. Appellant fails to demonstrate any error in this regard.

### (3) Cross-Examination of Detective Huffman

{¶ 81} Appellant lastly asserts the trial court erroneously interfered with defense counsel's cross-examination of Detective Huffman. During cross-examination, defense counsel asked Detective Huffman about the photo arrays presented to Sims on May 29, 2021. Detective Huffman assembled the photo arrays, but another detective, Detective Kelley, served as the blind administrator who administered the photo arrays to Sims on May 29, 2021. Detective Huffman affirmed that, although the blind administrator was supposed to record "any reactions or comments made by the witness," Detective Kelley did not write anything on the blind administrator forms. (Mar. 13, 2025 Tr. Vol. 4 at 660.) The prosecutor objected and a side-bar discussion occurred between the court and counsel outside the hearing of the jury.

{¶ 82} Defense counsel noted that state law required the blind administrator to accurately write down "any identification or nonidentification," and argued that Sims did "make some lukewarm identifications" on May 29, 2021. *Id*. at 661. The prosecutor noted that defense counsel should have raised any argument about the statutory requirements for administering photo arrays in a pretrial motion. *Id*. at 663, 672. Defense counsel told the

court he wasn't "asking [Detective Huffman] why [Detective Kelley] didn't do it, I'm asking that he didn't do it . . . just asking that, the basic, does he know that he didn't include all of that information." *Id*. at 665.

{¶ 83} The trial court told defense counsel she felt counsel was "trying to be clever with [her]," noting that everyone could see the blind administrator forms were blank. *Id*. at 666. The court stated if defense counsel wanted to "demonstrate that the paper [was] blank or if [he] want[ed] to ask detective Huffman whether he reviewed the recording [of the May 29, 2021 photo array presentation] and [could] speak to what detective Kelley may have said on the recording, then I'll allow that, but this conversation about technical necessary compliance with [R.C.] 2933.83, I'm not going to allow that." *Id*. at 676-677. Defense counsel responded to the court stating, "[h]e cant -- he can't state that the array wasn't done correctly?" *Id*. at 677. The court asked counsel if he was "asking [her] a question," and when counsel said he was, the court responded stating, "I've made my point clear. I've never been in a position where a lawyer feels like it's appropriate to question the Court." *Id*. at 677-678. The court then took a recess.

{¶ 84} Following the recess, the prosecutor noted the state would not object if defense counsel wanted to ask Detective Huffman "some limited questions" about the May 29, 2021 photo array, because Detective Huffman reviewed the presentation of the May 29, 2021 photo array in his role as the lead detective on the case. *Id*. at 681. Defense counsel apologized to the court, noting he would "never question [the court's] authority." *Id*. at 682. The court responded stating that, while counsel "did question [her]," she was "not bothered by it. It's not going to implicate or impact how [she felt] toward [him] or [his] client." *Id*. at 682.

{¶ 85} When the proceeding resumed in front of the jury, defense counsel did not ask Detective Huffman about Detective Kelley's failure to fill out the blind administrator forms. Instead, counsel asked Detective Huffman about the fact that Sims did not select appellant's photo from the arrays presented to him on May 29, 2021. (Tr. at 688.)

{¶ 86} Appellant contends that the amount of "vitriol directed" at defense counsel by the trial judge "had an unsettling effect on defense counsel," because he did not return to questioning Detective Huffman about Detective Kelley's failure to fill out the blind administrator forms when the trial resumed. (Appellant's Brief at 53.) However, appellant

merely speculates that the trial court influenced counsel's decision in this regard. The trial court ruled that counsel *could* cross-examine Detective Huffman about Detective Kelley's failure to complete the blind administrator forms; the court only prevented counsel from addressing Detective Kelley's purported failure to comply with R.C. 2933.83. Counsel may well have decided for tactical reasons it was not beneficial to continue questioning Detective Huffman about Detective Kelley's failure to fill out the blind administrator forms.

{¶ 87} Appellant further claims that the trial judge's conduct during defense counsel's cross-examination of Sims and Detective Huffman "conveyed to the jury an impression of her belief that he was using unfair means of discrediting a witness whom she believed was making an accurate identification of his nephew's killer." (Appellant's Brief at 53.) To the extent appellant appears to argue the trial judge was biased in favor of the state, we note that all of the trial court's statements to defense counsel occurred at side-bar discussions outside the hearing of the jury. "[A]cts or statements that suggest a trial judge's bias must be perceived by the jury to be prejudicial." *State v. Siddell*, 2007-Ohio-1875, ¶ 19 (6th Dist.), citing *State v. Wade*, 53 Ohio St.2d 182, 187-188 (1978). *Accord State v. Corrai*, 2005-Ohio-1156, ¶ 21 (10th Dist.) (noting that because the court's "comment was made outside of the presence of the jury," the comment could not have affected the jury's verdict).

{¶ 88} Accordingly, appellant has failed to demonstrate any violation of his rights under the Confrontation Clause or the Due Process Clause during defense counsel's cross-examination of either Sims or Detective Huffman. Based on the foregoing, we overrule appellant's fourth assignment of error.

## VI. Third Assignment of Error–Ineffective Assistance of Counsel

{¶ 89} In his third assignment of error, appellant asserts his trial counsel rendered constitutionally ineffective assistance. To prevail on an ineffective assistance of counsel claim, appellant must satisfy a two-part test. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989). "First, the defendant must show that counsel's performance was deficient." *Strickland* at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* "Questionable trial strategies and tactics, however, do not rise to the level of ineffective assistance of counsel." *State v. Mohamed*, 2017-Ohio-7468, ¶ 18, citing *State v. Clayton*, 62 Ohio St.2d 45, 49 (1980).

" 'Judicial scrutiny of counsel's performance is to be highly deferential, and reviewing courts must refrain from second-guessing the strategic decisions of trial counsel.' " *State v. Sallie*, 81 Ohio St.3d 673, 674 (1998), quoting *State v. Carter*, 72 Ohio St.3d 545, 558 (1995).

{¶ 90} The second prong of the *Strickland* test requires the defendant to "show that the deficient performance prejudiced the defense." *Strickland* at 687. To establish prejudice, a defendant must demonstrate "there exists a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *State v. Davis*, 2020-Ohio-309, ¶ 10, citing *Bradley* at paragraphs two and three of the syllabus. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Bradley* at 142, quoting *Strickland* at 694. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial [court] cannot be relied on as having produced a just result." *Strickland* at 686.

{¶ 91} The failure to demonstrate either prong of the *Strickland* test defeats a claim of ineffective assistance of counsel. *State v. Kennard*, 2016-Ohio-2811, ¶ 14 (10th Dist.), citing *Bradley* at 143. Therefore, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Strickland* at 697.

{¶ 92} Appellant asserts his trial counsel rendered ineffective assistance in the following ways: (1) counsel failed to file a pretrial motion to suppress Sims' identifications of him; (2) counsel failed to use the juvenile court transcripts to impeach Sims; (3) counsel failed to object to Detective Huffman's testimony indicating he eliminated Coleman as a suspect; (4) counsel failed to object to Detective Huffman's testimony bolstering Sims' identification of him; and (5) counsel failed to object to Officer Frisco's testimony identifying him as Fat Cat. We will address each argument in turn.

**(1) Motion to Suppress**

{¶ 93} Appellant claims his counsel rendered ineffective assistance by failing to file a motion to suppress Sims' pretrial and in-court identifications of him as the shooter. Under Ohio law, " '[t]rial strategy may include a motion to suppress evidence.' " *State v. Steward*, 2020-Ohio-4553, ¶ 68 (10th Dist.), citing *State v. Altman*, 2007-Ohio-6761, ¶ 20

(5th Dist.). Accordingly, the failure to file a motion to suppress constitutes ineffective assistance " 'only when the defendant can show that the motion "would have had a reasonable probability of success" and affected the outcome of the case.' " *Steward* at ¶ 68, quoting *State v. Riffle*, 2019-Ohio-3271, ¶ 9 (8th Dist.), quoting *State v. Patterson*, 2017-Ohio-8318, ¶ 35 (8th Dist.). *See State v. Oller*, 2017-Ohio-814, ¶ 62 (10th Dist.) (noting it is "not generally ineffective assistance to fail to engage in futile tactics").

{¶ 94} Courts engage in a two-step analysis to determine whether identification testimony should be suppressed. First, the court must determine whether the identification procedure was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. *State v. Monford*, 2010-Ohio-4732, ¶ 38 (10th Dist.), citing *Neil v. Biggers*, 409 U.S. 188 (1972). Second, the court must determine whether the identification itself was unreliable under the totality of the circumstances. *Id.*, citing *Neil*. *Accord State v. Waddy*, 63 Ohio St.3d 424, 438 (1992), citing *Neil* (stating that "[w]hen a witness has been confronted with a suspect before trial, due process requires a court to suppress her identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under all the circumstances"); *United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992). Thus, even if police use an unnecessarily suggestive identification procedure, exclusion is appropriate only when the improper police conduct created a " 'substantial likelihood of irreparable misidentification.' " *Perry v. New Hampshire*, 565 U.S. 228, 239 (2012), quoting *Neil* at 201. "[R]eliability [of the eyewitness identification] is the linchpin in determining the admissibility of identification testimony." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

{¶ 95} A lineup is unduly suggestive "if it steers the witness to one suspect, independent of the witness's honest recollection." *State v. Adams*, 2015-Ohio-3954, ¶ 208, citing *Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir. 2001). In assessing the reliability of the identification under the totality of the circumstances, courts consider the following factors: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and confrontation. *Neil* at 199-200. *Accord State v. Broom*, 40 Ohio St.3d 277, 284 (1988); *Waddy* at 439. The defendant bears the burden

of proving the identification was unreliable. *State v. Sharp*, 2009-Ohio-6847, ¶ 14 (10th Dist.)

{¶ 96} Appellant asserts the photo array was "unduly suggestive and conducive to a high risk of misidentification," because of the six individuals in the photo array he was the only person with visible facial injuries. (Appellant's Brief at 31.) Detective Huffman affirmed he used the photo taken of appellant at the time of his arrest to compile the photo array. (Mar. 13, 2025 Tr. Vol. at 731-732.) The photo depicts appellant with abrasions on his forehead and lip. (State's Ex. W8, 9.)

{¶ 97} However, even if we were to agree with appellant that the photo array was unnecessarily suggestive, appellant fails to demonstrate that Sims' identification of him was unreliable under the totality of the circumstances. The record demonstrates Sims had ample opportunity to view the gray hoodie shooter during the incident. The incident occurred during daylight hours and Sims was facing the young men during their initial interaction in the Popeye's parking lot. When the group went to the former Burger King parking lot, Sims had "a face-to-face conversation with the gentleman that [was] wearing the hooded sweatshirt and it [was] for a considerable period of time." (Mar. 12, 2025 Tr. Vol. 3 at 538; State's Ex. N1.) Sims then had extremely close contact with the gray hoodie shooter when the two fought over the gun. *Id.* at 551. Although the gray hoodie shooter had the hood of his sweatshirt pulled up, Sims stated he could clearly see the shooter's eyes, nose, and mouth, explaining he "saw his face visibly." (Mar. 11, 2025 Tr. Vol. 2 at 273.) Sims' degree of attention during the situation was high.

{¶ 98} Detective Huffman affirmed that Sims gave police a description of the shooter on May 29, 2021, but the record does not contain the full description. (Mar. 13, 2025 Tr. Vol. 4 at 657.) Defense counsel asked Detective Huffman about Sims' description of the shooter's height, and Detective Huffman affirmed Sims described the shooter as being between 5' 6" and 5' 8". *Id.* at 658. Nothing in the record indicated that Sims gave police an inaccurate description of the shooter. *Id.* at 732-733.

{¶ 99} Sims' level of certainty when he selected appellant's photo from the June 6, 2021 photo array was extremely high. As noted, the audio recording of the June 6, 2021 photo array presentation documented how Sims instantly identified appellant from the third photo array, how he was certain appellant was the shooter, and how he sought to

retract his earlier identification of Coleman once he saw appellant's photo. (State's Ex. W10 at 7:52; Mar. 11, 2025 Tr. Vol. 2 at 329.)

{¶ 100} The shooting occurred on May 24, 2021 and Sims selected appellant's photo from the array on June 6, 2021, only 13 days later. The short time frame between the shooting and the identification weighed in favor of reliability. *See State v. Brust*, 2000 Ohio App. LEXIS 1250, *7-8 (10th Dist. Mar. 28, 2000) (finding a span of 13 days between the incident and the identification weighed in favor of reliability); *State v. Koester*, 1989 Ohio App. LEXIS 1179 (10th Dist. Mar. 28, 1989) (11 days); *State v. Jones*, 1992 Ohio App. LEXIS 3470, *6 (8th Dist. July 2, 1992) (3 weeks).

{¶ 101} Considering the *Neil* factors, the record demonstrates that Sims' identification of appellant from the June 6, 2021 photo array was reliable under the totality of the circumstances. *See State v. Bean*, 2006-Ohio-6745, ¶ 17 (10th Dist.). As such, a motion to suppress Sims' pre-trial identification of appellant would not have been successful.

{¶ 102} Appellant also asserts that Sims' contradictory identifications in juvenile court "eliminate[d] any possibility that an in-court identification during the jury trial would be based on Sims' observations at the time of the shooting." (Appellant's Brief at 32.) "An in-court identification typically occurs under circumstances which suggest the identity of the defendant." *Monford* at ¶ 58 (10th Dist.), citing *State v. Johnson*, 2005-Ohio-4243, ¶ 55 (10th Dist.). As such, the admissibility of an in-court identification depends on whether the identification was reliable under the totality of the circumstances. *Id. See Hill*, 967 F.2d at 232, citing *United States v. Rundell*, 858 F.2d 425 (8th Cir. 1988) (noting that so long as the identification testimony was "sufficiently reliable under the [*Neil v.*] *Biggers* test," it could "overcome any likelihood of misidentification created by the nature of a courtroom confrontation").

{¶ 103} Although the trial occurred nearly four years after the May 24, 2021 shooting, the remaining reliability factors strongly indicated that Sims' identification of appellant at trial was reliable. Indeed, Sims had ample opportunity to view the gray hoodie shooter and had extremely close contact with him during the incident. Sims also was certain in his identification of appellant at trial. (Mar. 11, 2025 Tr. Vol. 2 at 258-259.) Sims' contradictory identifications in juvenile court affected the weight and credibility of his trial

testimony but did not render his in-court identification of appellant unreliable under the *Neil* factors. *See Brust*, 2000 Ohio App. LEXIS 1250, at *7-8, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus (stating that, because the witness's identification was reliable under the *Neil* factors, the trial court properly denied the defendant's motion to suppress, and that "[t]o the extent defendant argues that the testimony was confusing, inconsistent and contradictory, questions of weight and credibility of the testimony are within the province of the trier of fact").

{¶ 104} Accordingly, appellant fails to demonstrate that a motion to suppress either Sims' pre-trial or in-court identifications of him would have been successful. As such, appellant's attorney's failure to file a motion to suppress Sims' identifications did not amount to deficient performance.

### (2) The Juvenile Court Transcripts

{¶ 105} Appellant asserts his trial counsel rendered deficient performance by failing to utilize the juvenile court transcripts to impeach Sims' in-court identification of him as the shooter. As noted in our analysis of appellant's fourth assignment of error, however, counsel did attempt to impeach Sims with his prior identification of Hoskins-Battle as the gray hoodie shooter in juvenile court. Sims' statement indicating he did not recall testifying in juvenile court precluded defense counsel from impeaching him with his prior statements from juvenile court pursuant to Evid.R. 613(A).

{¶ 106} Appellant contends his attorney's "cursory examination of Sims failed to capture the most damaging aspects" of Sims' testimony from juvenile court, including the fact that Sims stated it would take "everything in [his] power to get this man" before he identified Hoskins-Battle and that Sims "believed Jones was the <u>same</u> person whom he had identified one day earlier during Hoskins-Battle's hearing." (Emphasis in original.) (Appellant's Brief at 34.) However, "[t]he extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *State v. Leonard*, 2004-Ohio-6235, ¶ 146. " '[A]n appellate court reviewing an ineffective assistance of counsel claim must not scrutinize trial counsel's strategic decision to engage, or not engage, in a particular line of questioning on cross-examination.' " *State v. Dorsey*, 2005-Ohio-2334, ¶ 22 (10th Dist.), quoting *In re Brooks*, 2004-Ohio-3887, ¶ 40 (10th Dist.).

{¶ 107} Defense counsel's strategic choices regarding what portions of the juvenile court transcript to question Sims about clearly fell within the ambit of trial strategy. *See State v. Brodbeck*, 2008-Ohio-6961, ¶ 65 (10th Dist.) (noting that counsel's "decision not to cross-examine the state's witnesses on this issue may well demonstrate counsel's competence and skill"). Appellant fails to demonstrate his attorney's use of the juvenile court transcripts during Sims' cross-examination amounted to deficient performance.

**(3) Failing to Object to Detective Huffman's testimony regarding Coleman**

{¶ 108} Appellant contends his trial counsel rendered deficient performance by failing to object when Detective Huffman stated he eliminated Coleman as a suspect. "[T]he failure to object to testimony is not necessarily an indicator of ineffective assistance of counsel, because the decision not to object may be for tactical reasons." *State v. Gordon*, 2011-Ohio-4208, ¶ 27 (10th Dist.), citing *State v. Jackson*, 2003-Ohio-6183, ¶ 81 (10th Dist.). When a claim of ineffective assistance of counsel is based on counsel's failure to object to testimony, the appellant must demonstrate a reasonable probability that the objection would have been successful and that the outcome of the proceeding would have differed as a result. *State v. Jones*, 2019-Ohio-2134, ¶ 52 (10th Dist.); *State v. Thompson*, 2019-Ohio-2525, ¶ 15 (10th Dist.).

{¶ 109} Detective Huffman stated that, when he arrived at the crime scene on the night of the murder, one of the other detectives informed him the suspects "may have gone to [] North Central Avenue" and that the nickname of one of the persons of interest was "Turtle." (Mar. 13, 2025 Tr. Vol. 4 at 650.) During his investigation, Detective Huffman learned Coleman went by the nickname Turtle. *Id.* at 521. However, Detective Huffman also stated that in his experience young people's nicknames tended to not be very accurate. *Id.* at 521.

{¶ 110} On cross-examination, Detective Huffman admitted that on the night of the murder police received a call indicating that someone by the name of Turtle was at a house on Hayden Avenue "bragging about possibly committing this crime." *Id.* at 654. Defense counsel asked Detective Huffman if he had officers go to the Hayden Avenue house to investigate the call, and Detective Huffman stated "[n]ot that night, no." *Id.* at 655. Defense counsel asked Detective Huffman why he did not do so, and Detective Huffman explained he was not "in that point of our investigation yet where we should probably go into that

house," noting there "could have been 15 other Turtles in the same neighborhood as far as [he] knew." *Id*. at 655. On redirect examination, Detective Huffman stated he spoke with Coleman during the course of his investigation and that, as a result of speaking with him, he "[a]bsolutely" was able to eliminate Coleman as a suspect. *Id*. at 713-714.

{¶ 111} Appellant claims Detective Huffman's testimony indicating he eliminated Coleman as a suspect was "objectionable" under *Cooper v. Sowders*, 837 F.2d 284 (6th Cir. 1988) (superseded on other grounds by statute in 28 U.S.C. 2254). In *Cooper*, the prosecutor asked a detective whether he found "any evidence" demonstrating that four individuals other than the defendant "had anything to do with this murder?" *Id*. at 287. The detective responded stating he "found no evidence that would link any of those other suspects to this crime," and that the "only evidence [he] found that would link anyone to this crime would be Mr. Cooper." *Id*. at 287. The Sixth Circuit found the detective's testimony inadmissible. The court noted that, by indicating the evidence against the other suspects was insufficient while also "stat[ing] that all of the evidence pointed to petitioner as the perpetrator of the crime," the detective's testimony had a "direct influence on the jury's consideration of petitioner's guilt or innocence." *Id*. at 287.

{¶ 112} In the present case, Detective Huffman stated only that as a result of his investigation he was able to eliminate Coleman as a suspect. The fact Coleman had been eliminated as a suspect was based on Detective Huffman's perception during his investigation. Because defense counsel asked Detective Huffman on cross-examination why he did not investigate the individual named Turtle who appeared to be bragging about committing the murder, Detective Huffman's testimony indicating he investigated Coleman and eliminated him as a suspect was necessary to explain the result of his investigation to the jury. Accordingly, Detective Huffman's testimony was admissible. *See* Evid.R. 701; *State v. Scott*, 1994 Ohio App. LEXIS 3364, *17-18 (12th Dist. Aug. 1, 1994) (finding the detective's testimony stating he eliminated certain individuals as suspects admissible because "the fact that other individuals were no longer suspects was based on Deputy Petite's perception" during his investigation, and the testimony was "necessary to ensure that the jury had a clear understanding of the facts in the case"); *Warth v. Warden, London Corr. Inst.*, 2025 U.S. Dist. LEXIS 260786, *13 (S.D.Ohio Dec. 17, 2025) (noting that a "trial court does not commit reversible error by permitting police officers to testify

about the process of their investigation"); *Patterson v. Curtin*, 2016 U.S. Dist. LEXIS 102344, *20-21 (W.Dist.Mich. Aug. 4, 2016) (concluding the detective's "testimony did not constitute improper opinion testimony regarding defendant's guilt," because the detective merely stated he spoke to a certain individual during his investigation and "was able to eliminate him as a suspect").

{¶ 113} Thus, an objection to Detective Huffman's testimony indicating he eliminated Coleman as a suspect would not have been successful. Appellant fails to demonstrate his attorney rendered deficient performance in this regard.

### (4) Failing to Object to Detective Huffman's statements bolstering Sims' identification

{¶ 114} Appellant contends his trial counsel rendered ineffective assistance by failing to object to Detective Huffman's testimony bolstering Sims' identification of appellant from the June 6, 2021 photo array.

{¶ 115} Detective Huffman affirmed at trial that he listened to the audio recording of the June 6, 2021 photo array presentation. The prosecutor then asked Detective Huffman to describe, "based on [his] training and experience, which of those would you say were good picks or positive identifications and which ones weren't?" (Mar. 13, 2025 Tr. Vol. 4 at 598.) Detective Huffman responded stating "[n]umber one and number two were not good picks," while "[n]umber three would have been a very good pick." *Id*. at 598. Detective Huffman explained he believed a good pick came from the "confidence in the voice of the picker," noting that the "time span it usually takes for them to pick that out, to me, in my past experiences, usually if they've picked really quick, that stands out to me that they have a pretty good mental picture of who they're trying to identify in these photos." *Id*. at 598. Detective Huffman further noted that, while on the "first photo array, there was a lot of uncertainty in anything that was done when he's looking at photos, no picks, long time staring at the photos," the third photo array "was an immediate pick. I mean, it was as soon as the photo was put in front of him, immediately he picked Mr. Jones, number 1, and was adamant that he was the shooter." *Id*. at 725.

{¶ 116} A lay witness may not give an opinion regarding whether another witness "was truthful in his identification." *State v. Bush*, 1991 Ohio App. LEXIS 4746, *12 (10th Dist. Oct. 3, 1991). "[T]he opinion of a witness as to whether another witness is being truthful is inadmissible." *State v. Potter*, 2003-Ohio-1338, ¶ 38 (8th Dist.). In *Bush*, a

detective testified he believed a key witness was "hesitant" when he identified the defendant from a photo array. The detective explained he "referred to hesitant as when a witness appears to be scared or frightened and he's trying to avoid telling me the truth. Normally this is because he fears retaliation or something if he does cooperate with me." *Id.* at *11. The *Bush* court found the detective "was not merely describing the witnesses' reaction and his own definition of 'hesitant,' " but rather the "testimony was simply a lay opinion as to whether [the witness] was truthful in his identification." *Id.* at *12. As such, the trial court found the detective's testimony "amounted to his giving an impermissible opinion as to the credibility of a particular witness's testimony." *Id.* at *12.

{¶ 117} In the present case, Detective Huffman's statements indicating that Sims' selection of appellant's photograph was a "very good pick," while Sims' selection of Coleman's photograph was "not [a] good pick[]," amounted to impermissible opinion testimony. While Detective Huffman could generally describe what he believed made any given selection stronger or weaker, by labeling Sims' selection of appellant's photograph a "good pick" Detective Huffman invaded the jury's province to decide for themselves whether Sims' identification of appellant was truthful.

{¶ 118} Nevertheless, even if the court had sustained an objection to Detective Huffman's testimony, we find no reasonable probability that the outcome of the trial would have differed as a result. The jury heard the audio recording of the June 6, 2021 photo array presentation, and thus heard Sims' hesitancy in selecting Coleman's photograph and the immediacy with which Sims selected appellant's photograph. The jury also heard how Sims sought to retract his selection of Coleman's photograph once he saw appellant's photograph. Accordingly, the strength of Sims' selection of appellant's photograph was obvious from the record even absent Detective Huffman's opinion testimony. Sims also identified appellant at trial as the gray hoodie shooter and, as noted above, the circumstantial evidence from appellant's cellphone strongly demonstrated that appellant committed the May 24, 2021 shooting. Accordingly, defense counsel's failure to object to Detective Huffman's bolstering statements did not amount to constitutionally ineffective assistance of counsel.

**(5) Failing to object when Officer Frisco identified appellant as Fat Cat**

{¶ 119} Appellant asserts his counsel rendered deficient performance by failing to object when Officer Frisco falsely identified him as Fat Cat. However, Detective Huffman testified before Officer Frisco at trial, and stated that Fat Cat was the nickname of Hoskins-Battle. Accordingly, defense counsel may have made the tactical choice not to object to Officer Frisco's testimony to avoid highlighting that testimony for the jury. *See Hartman*, 2020-Ohio-4440, ¶ 67 (noting that, "[d]epending on the nature of the other-acts evidence and the context in which it is used, defense counsel may as a matter of strategy wish to avoid highlighting the evidence for the jury"); *State v. Grubbs*, 2025-Ohio-2756, ¶ 70 (1st Dist.) (stating the defendant failed to show "that counsel's failure to object to the [other-acts] evidence was not a part of counsel's trial strategy").

{¶ 120} Moreover, in our analysis of appellant's second assignment of error, we found the admission of the drive-by shooting evidence amounted to harmless error. "When an error is harmless, the appellant 'cannot show the necessary prejudice required to support an ineffective assistance of counsel claim.' " *State v. Mavrakis*, 2015-Ohio-4902, ¶ 54 (9th Dist.), quoting *State v. Blankenship*, 1993 Ohio App. LEXIS 4372, *4 (9th Dist. Sept. 1, 1993). *Accord Flowers v. Morrison*, 2024 U.S. App. LEXIS 12196, *7 (6th Cir. May 20, 2024) (noting that the "harmless-error determination precluded any possibility that Flowers could establish *Strickland* prejudice"). Accordingly, appellant cannot establish a reasonable probability that the outcome of his trial would have differed if the court sustained an objection to Officer Frisco's testimony.

**(6) Cumulative Error**

{¶ 121} Appellant lastly asserts that the combined effect of defense counsel's errors was sufficient to undermine confidence in the outcome of his trial. Under the doctrine of cumulative error, "a judgment may be reversed where the cumulative effect of errors deprives a defendant of his constitutional rights, even though the errors individually do not rise to the level of prejudicial error." *State v. Johnson*, 2010-Ohio-5440, ¶ 34 (10th Dist.), citing *State v. Garner*, 1995-Ohio-168, ¶ 62. *State v. Graham*, 2020-Ohio-6700, ¶ 169. *See also State v. C.D.S.*, 2021-Ohio-4492, ¶ 112 (10th Dist.). However, "when none of the individual claims of ineffective assistance of counsel have merit, cumulative error cannot be established simply by joining those meritless claims together." *Graham* at ¶ 170.

Because none of appellant's individual claims of ineffective assistance of counsel have merit, appellant cannot demonstrate cumulative error.

{¶ 122} Based on the foregoing, we overrule appellant's third assignment of error.

## VII. Fifth Assignment of Error–Leg Irons

{¶ 123} In his fifth assignment of error, appellant asserts the trial court violated his rights to due process and a fundamentally fair trial by requiring him to wear leg irons at trial. "[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck v. Missouri*, 544 U.S. 622, 629 (2005). The presence of visible shackles undermines the presumption of innocence and the related fairness of the fact-finding process. *State v. Black*, 2017-Ohio-3001, ¶ 7 (10th Dist.), citing *Deck* at 630. Shackles may also interfere with a defendant's ability to participate in his own defense and undermine the formal dignity of the judicial process. *Id.*, citing *Deck* at 631. "Thus, no defendant should be tried while shackled, except as a last resort." *Id.* *See also State v. Adams*, 2004-Ohio-5845, ¶ 104, quoting *State v. Kidder*, 32 Ohio St.3d 279, 285 (1987) (noting courts "have long recognized that 'no one should be tried while shackled, absent unusual circumstances' ").

{¶ 124} A criminal defendant does not, however, have an absolute right to be free from shackles at trial. *State v. Chester*, 2008-Ohio-6679, ¶ 6 (10th Dist.), citing *State v. Blackmon*, 1995 Ohio App. LEXIS 555 (10th Dist. Feb. 15, 1995). Shackling may be necessary for the safe, reasonable, and orderly progress of the trial. *Id.*, citing *State v. Morgan*, 84 Ohio App.3d 229, 232 (5th Dist. 1992). "[I]t is widely accepted that a trial court may require a defendant to be shackled where there is a risk of violence or escape." *State v. Burks*, 2024-Ohio-17, ¶ 38 (10th Dist.), citing *State v. Hughes*, 2015-Ohio-151, ¶ 21 (10th Dist.).

{¶ 125} The decision whether to shackle a criminal defendant during trial lies within the sound discretion of the trial court, and the record should reflect the factors upon which the trial court exercised its discretion. *Chester* at ¶ 5, citing *Morgan* at 229. *Accord State v. Franklin*, 2002-Ohio-5304, ¶ 79. A trial court must actually exercise its own discretion and should not leave the issue up to security personnel without inquiring into the security official's specific concerns. *State v. Reynolds*, 2019-Ohio-2343, ¶ 48 (10th

Dist.), citing *Adams* at ¶ 104. The Supreme Court of Ohio encourages, but does not require, courts to hold a hearing to determine whether the defendant should be shackled at trial. *See State v. Neyland*, 2014-Ohio-1914, ¶ 92-94.

{¶ 126} "When an appellate court reviews a trial court's unsupported decision to shackle a defendant for trial, a key consideration is whether the shackles were visible to the jury." *State v. Robertson*, 2026-Ohio-1147, ¶ 50 (10th Dist.). Any error in a court's decision to shackle a defendant is harmless if "nothing in the record indicates the jury ever saw appellant wearing the leg irons," "the trial court took care to prevent the jury from seeing the leg irons," and "nothing in the record suggests [the] appellant was unable to effectively communicate with his counsel due to the leg irons." *Hughes* at ¶ 23-27. *Accord Chester* at ¶ 11-14. *See also State v. Froman*, 2020-Ohio-4523, ¶ 73, quoting *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 842 (6th Cir. 2017), quoting *Earhart v. Konteh*, 589 F.3d 337, 349 (6th Cir. 2009) (noting a " 'claim based on *Deck* "rises or falls on the question of whether the [restraining device] was visible to the jury" ' ").

{¶ 127} Prior to the commencement of voir dire, defense counsel asked the trial court to remove appellant's handcuffs and leg irons. The judge asked the courtroom deputies if they had "any concerns," noting she knew "the sheriff's office likes to maintain leg irons. Any concerns about the handcuffs, gentleman?" (Mar. 10, 2025 Tr. Vol. 1 at 6-7.) A deputy responded stating, "[t]he handcuffs can come off." *Id*. at 7. The court said, "[a]ll right. We'll remove the handcuffs, we'll maintain the leg irons. The Franklin County Sheriff's Office, under our local rules, is in charge of court security and so I will defer to their expertise and will maintain the leg irons." *Id*. at 7. Defense counsel did not object to the court's ruling. Subsequently, after the prospective jurors exited the courtroom during a break in the voir dire proceedings, the court stated, "Mr. Jones, one second. Don't ever move until I tell you to move. You're going to risk them seeing something that you don't want them to see. So just wait until they're all the way out of the room and then you can do what you need to do. Okay?" *Id*. at 90.

{¶ 128} While appellate courts typically review the use of physical restraints on a defendant at trial for harmless error, in the absence of a timely objection, we review the improper use of shackles for plain error. *Black* at ¶ 16; *Neyland* at ¶ 99. Because defense counsel did not object to the court's ruling to maintain appellant's leg irons in the present

case, we review for plain error. Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." For an error to constitute "plain error" under Crim.R. 52(B), it must satisfy three prongs: (1) there must be an error, meaning a deviation from a legal rule, (2) the error must be "plain," meaning an "obvious" defect in the trial proceedings, and (3) the error must have affected "substantial rights," meaning the error must have affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). An appellate court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice. *State v. Pilgrim*, 2009-Ohio-5357, ¶ 58 (10th Dist.), citing *State v. Saleh*, 2009-Ohio-1542, ¶ 68 (10th Dist.). The defendant bears the burden of demonstrating plain error. *State v. Perry*, 2004-Ohio-297, ¶ 14.

{¶ 129} Appellant points to no evidence in the record, and we find none, indicating that the jury ever saw his leg irons. The trial judge's instruction to appellant not to move until the court told him to move, in order to avoid having the jury "seeing something that you don't want them to see," was some indication that the court took steps to ensure the jury would not see his leg irons. (Mar. 10, 2025 Tr. Vol. 1 at 90.) Finally, nothing in the record indicates appellant was unable to effectively communicate with his counsel or participate in his defense due to the leg irons. Accordingly, even if the trial court failed to exercise its own discretion when deciding whether to maintain appellant's leg irons, any error in this regard amounted to harmless error. *Hughes* at ¶ 23-27; *Chester* at ¶ 11-14. As such, appellant fails to demonstrate plain error resulting from the court's decision to maintain his leg irons during the trial. *See Robertson* at ¶ 63.

{¶ 130} Based on the foregoing, we overrule appellant's fifth assignment of error.

## VIII. Conclusion

{¶ 131} Having overruled appellant's first, second, third, fourth, and fifth assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN and JAMISON, JJ., concur.

————————————